UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| LAMONT WILLIAMSON, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 1:17-cv-161-SNLJ |
| MINA MASSEY, | ) | |
| Defendant. | ) | |

## **MEMORANDUM and ORDER**

Plaintiff, pro se, is a prisoner incarcerated in the Missouri Department of Corrections. He brought this 42 U.S.C. § 1983 lawsuit alleging violations of his constitutional rights related to the treatment of an alleged tumor in his nostril. Defendant Dr. Mina Massey has moved for summary judgment.

### I.  Factual Background

Plaintiff claims that defendant Dr. Massey failed to properly treat a "tumor" that was growing in his nose. The first time plaintiff reported any issues regarding his nose was February 9, 2014. He told a nurse that his nose would become dry and bleed. Plaintiff saw defendant for the first time on February 23, 2014, for multiple complaints, including nosebleeds. He did not mention any lump in his nose. Defendant ordered nasal saline spray for 180 days to moisten plaintiff's nasal passages and eliminate the nosebleeds.

On April 7, plaintiff submitted a Medical Services Request ("MSR") form complaining of a lump in his nasal passage that smelled bad, was draining, and was

bleeding. Defendant saw plaintiff on April 10 to follow up on plaintiff's earlier ear complaints. At that visit, plaintiff told defendant about the bump inside his right nare. Plaintiff reported that three months earlier, he bit a staple in half, stuck it on an ink pen, and used it to remove the lump. Plaintiff said he thought it was a booger. But he also stated it was like a piece of flesh. Since that time, plaintiff reported that he had nasal congestion and drainage from his right nare.

Defendant examined plaintiff's right nare and noted mild erythema, swelling, and yellow purulent discharge, but no masses. Plaintiff's left nare and throat were normal. Defendant diagnosed rhinosinusitis, which is an inflammation of the nasal passages and sinus cavities, usually caused by allergy or infection. She prescribed an antibiotic for 10 days and told plaintiff to submit an MSR if he did not improve.

Plaintiff submitted MSRs on April 22, April 27, and May 3. He complained he had a lump in his nasal passage and could barely breathe at times. A nurse examined plaintiff on May 7 and noted he had no drainage or lump. On May 25, plaintiff declared a medical emergency for a nosebleed and was sent to the emergency room at Missouri Delta Medical Center. Plaintiff admitted to the ER doctor that he picked his nose to induce bleeding. The ER doctor wrote a prescription for an antibiotic, and, as an alternative treatment plan, suggested that plaintiff follow up with an otolaryngologist, which is an ear, nose, and throat specialist ("ENT"). Notably, the ER staff did not document that there was any nasal mass, tumor, or cancer. After reviewing the records, defendant did not believe an ENT visit was necessary. She believed that plaintiff's

nosebleeds were caused by his picking his nose to induce bleeding, and no appointment was made with an ENT.

On June 3, plaintiff saw nonparty Dr. Garcia to follow up on his trip to the ER. Plaintiff reported he had a problem with chronic nosebleeds and admitted he had a problem with picking his nose in order to cause bleeding. Dr. Garcia noted that nothing was found in ER and that "if the issue continues will need to see ENT."

On June 11, plaintiff saw a nurse for complaints of a nosebleed and was sent to the ER again. Nonparty ER doctor Mansell performed an anterior nasal packing/cauterization of the right nare and applied a nasal tampon and rhino rocket. He was discharged several hours after arriving. Plaintiff claims he "coughed up" a "tumor" during placement of the rhino rocket and gave it to a nurse, but there is no record of such an occurrence.

Dr. Mansell prescribed narcotic pain medicine, Norco, for plaintiff and provided him with four tablets on discharge. Plaintiff also received Zofran to prevent nausea and morphine in the ER. Narcotics are generally not prescribed in the prison setting. Dr. Massey determined that, based on the cauterizations she has performed on patients, that Tylenol was sufficient to control pain post-procedure. Dr. Massey states that most pain occurs during the procedure. Had plaintiff still had pain, she would have prescribed Tramadol, a narcotic pain reliever, but she wanted plaintiff to try the Tylenol first.

Plaintiff was placed in the prison infirmary after he returned from the ER. Approximately 12 hours after his discharge from the ER, defendant Massey saw plaintiff for followup. Plaintiff was agitated, as he wanted the Norco tabs and other followup care

he thought he needed. Plaintiff would not stop yelling to allow defendant to explain her treatment plan. Defendant believed it was unsafe for her to enter his room at that time, so she walked away. Plaintiff became more agitated and pulled the nasal tampon out of his nose, inducing bleeding. Defendant instructed nurses to re-pack the nostril and apply and ice pack after plaintiff regained control of himself. Plaintiff refused treatment. Plaintiff was kept under observation until bleeding resolved on its own the next day, and he was returned to his cell.

Defendant again saw plaintiff on June 17, four days after being discharged from the infirmary, and she was again unable to examine plaintiff due to his belligerence. She noted, however, that plaintiff had no active bleeding and his blood counts were normal.

Plaintiff again self-declared an emergency for a nosebleed on August 3. No active bleeding was observed, but the nurse packed the nostril and provided an ice pack. The nurse instructed plaintiff to refrain from taking ibuprofen and to start taking his blood pressure medicine.

On August 20, defendant saw plaintiff after mental health referred him to medical for nosebleeds. A psychiatrist had apparently looked in plaintiff's nose and saw an ulceration and believed defendant should examine him. Defendant observed a small amount of dried mucus but no ulceration or source of bleeding. Plaintiff insisted on an ENT referral as recommended earlier by the ER doctor. Defendant attempted to explain that the ER recommendation was not a referral, but plaintiff would not listen. That was the last visit defendant had with plaintiff about nosebleeds, though she did see plaintiff again in September and October 2014 for scabies.

4

Plaintiff alleges that in summer 2015, a nurse found a dime-sized hole in his right nostril, but no such encounter exists in the medical records. The medical records show he told other providers about the "tumor" in his nose, but that there was no documentation of any such tumor.

Plaintiff's mental health history included mood disorder, antisocial personality disorder, and a history of psychosis/malingering. Defendant suggests that these diagnoses help explain defendant's difficulties in communicating with plaintiff.

## II.  Motion for Summary Judgment

### A.  Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir.1988). After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing that there is a genuine dispute of a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 324. In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any

inferences that logically can be drawn from those facts. *Matsushita,* 475 U.S. at 587; *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005).

    **B.**    **Discussion**

A prisoner's Eighth Amendment rights are only violated if prison officials exhibit deliberate indifference to the prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976). To prevail, the plaintiff must demonstrate that (1) he suffered an objectively serious medical need, and (2) prison officials knew of but deliberately disregarded that need. *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000).

Plaintiff argues that he had a tumor in his nose, or at the very least frequent nosebleeds, that rise to the level of an objectively serious medical need. The Court agrees that a nose tumor would constitute a serious medical need, but there is no evidence that plaintiff ever had or has a tumor. Even to the extent that plaintiff's nose condition constituted a serious medical need, plaintiff cannot show that defendant deliberately disregarded that need. Defendant determined, based on her medical opinion and plaintiff's own admissions, that plaintiff was causing nosebleeds intentionally. As a result, she determined that a referral to an ENT specialist was not necessary. "[P]risoners do not have a constitutional right to any particular type of treatment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). A "mere difference of opinion over matters of expert medical judgment or a course of medical treatment" does not rise to the level of a constitutional violation. *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010).

Similarly, to the extent plaintiff claims defendant was deliberately indifferent by denying plaintiff narcotic pain medication, that claim fails. Plaintiff was counseled to

take Tylenol and, if that was ineffective, defendant would have offered a different narcotic from what the ER doctor prescribed. Defendant explained that narcotic medications are discouraged in the prison environment unless strictly necessary. Plaintiff's pain, to the extent he had pain after the cauterization procedure was complete, was not ignored. His claim amounts to a disagreement with defendant regarding choice of pain medication, which does not rise to the level of a constitutional violation. *See id.*

Finally, even medical malpractice does not amount to a constitutional violation. *Dulany v. Carnahan*, 132 F.3d 1234, 1239, 1243 (8th Cir. 1997). "A showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions." *Pietrafeso v. Lawrence Cnty., S.D.*, 452 F.3d 978, 983 (8th Cir. 2006).

Defendant's motion for summary judgment will be granted.

## III. Disclosure of Violation by Corizon, Inc. (#27)

Plaintiff states that in August 2018 he submitted to MDOC's medical staff designee a "motion of interrogatory" on several individuals but that he received no substantive responses. Plaintiff seeks sanctions against Corizon. Federal Rule of Civil Procedure 33(a)(1) provides that a party may serve interrogatories "on any other party." The Court cannot compel nonparties to answer interrogatories. Further, the Court notes that plaintiff did not certify, in accordance with Rule 37(d)(1)(B) that he attempted to confer with the party who failed to act to try to obtain compliance without court action. To the extent plaintiff's disclosure can be construed as a motion for sanctions, it is denied.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment (#19) is GRANTED.

**IT IS FURTHER ORDERED** that plaintiff's motion for sanctions (#27) is DENIED.

Dated this 10th day of April, 2019.

                                             STEPHEN N. LIMBAUGH, JR.
                                             UNITED STATES DISTRICT JUDGE